**UNITED STATES of America,**

**v.**

**John N. MITCHELL et al., Defendants.**

**No. 73 Cr. 439.**

United States District Court,
S. D. New York.

Aug. 29, 1973.

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, John R. Wing, James W. Rayhill, John A. Lowe, Kenneth R. Feinberg, Asst. U. S. Attys., of counsel, for the United States.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant John N. Mitchell; Peter E. Fleming, Jr., John E. Sprizzo, New York City, of counsel.

Segal & Hundley, New York City, for defendant John N. Mitchell; William G. Hundley, Marvin B. Segal, New York City, of counsel.

Carr, Bonner, O'Connell, Kaplan, Thompson & Diuguid, Washington, D. C., for defendant Maurice H. Stans; Walter J. Bonner, Edward C. O'Connell, John P. Diuguid, Washington, D. C., of counsel.

Wilkinson, Cragun & Barker, Washington, D. C., for defendant Maurice H. Stans; Robert W. Barker, Washington, D. C., of counsel.

Greenhill & Speyer, New York City, for defendant Maurice H. Stans; Simon Greenhill, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

Defendants John N. Mitchell and Maurice H. Stans are charged in a multi-count indictment alleging conspiracy, obstruction of justice and perjury. Specifically, count 1 charges that Mitchell and Stans together with defendants

Harry L. Sears and Robert L. Vesco conspired to obstruct justice in relation to an S.E.C. investigation of and subsequent judicial proceedings against Vesco and to defraud the United States in relation to the lawful functions of the S.E.C. and the G.A.O. Counts 2, 3 and 4 charge each of the defendants with endeavoring to obstruct justice in relation to the various stages of the proceedings against Vesco. Counts 5 through 10 charge the defendant Mitchell with the commission of perjury before the Grand Jury. Counts 11 through 16 contain similar perjury charges with respect to defendant Stans.

Defendants Mitchell and Stans have made the full gamut of pretrial motions. For the purposes of exposition we treat these motions chronologically, examining first those motions addressed to the Grand Jury proceedings; continuing with those motions addressed to the sufficiency and structure of the indictment and those seeking discovery; and, concluding with those motions addressed to the problems of pretrial publicity and preparation for trial.

## I—THE GRAND JURY PROCEEDINGS

### The Parkinson Testimony

■ Defendant Maurice H. Stans moves to dismiss the indictment on the grounds that his Fifth and Sixth Amendment rights were violated by the questioning of Kenneth Wells Parkinson before the Grand Jury.[1] The motion is denied. The motion for alternative relief suppressing Mr. Parkinson's testimony before the Grand Jury and certain documents is granted.

The relevant facts as contained in the affidavits of Mr. Parkinson and Assistant United States Attorney James W.

Rayhill and as further developed at an evidentiary hearing held on August 15, 1973, may be briefly summarized.

Kenneth Wells Parkinson is an attorney maintaining law offices in Washington, D. C. Commencing in late June of 1972 and continuing to date, Parkinson has represented defendant Stans in connection with various civil actions brought against and on behalf of the Finance Committee to Re-elect the President. In addition, up to the latter part of April 1973, Parkinson represented the defendant Stans in connection with the Grand Jury investigation leading to this indictment.

On May 3, 1973, (after the termination of Parkinson's representation of Stans in connection with the Grand Jury proceedings) Parkinson met with Assistant United States Attorney Rayhill at the latter's office in New York. The meeting was initiated at Rayhill's request. Parkinson arrived at the meeting accompanied by one Ralph Albright. Rayhill advised Parkinson of his constitutional rights and indicated that the meeting could not continue in the presence of Albright.[2] After Albright had left the room, the meeting proceeded with a discussion of the issue of the attorney-client privilege. It was mutually agreed that no matters covered by the privilege would be explored. Rayhill questioned Parkinson with regard to certain meetings during the summer and fall of 1972 concerning the Vesco contribution. At the close of the interview, Rayhill indicated his dissatisfaction with Parkinson's responses and advised Parkinson that it would be a "tragic mistake" not to tell the whole truth. Parkinson agreed to resume the interview the following day.

On the morning of May 4, 1973, Parkinson met with Rayhill and Assistant

---

1. The defendant Mitchell sought permission to join in this motion at the hearing held on August 15, 1973. Such permission was denied for lack of standing. We think it clear from the evidence adduced at that hearing, that an attorney-client relationship did not exist as between Mr. Parkinson and defendant Mitchell.

2. Rayhill requested that Albright leave because of an "office policy" excluding persons other than the personal attorney for the subject being interviewed.

United States Attorney John R. Wing. Wing advised Parkinson of his constitutional rights and warned him not to discuss areas within the attorney-client privilege vis-a-vis defendant Stans. The interview again centered on meetings concerning the Vesco contribution. During the course of the interview, Parkinson indicated his belief that certain questions touched upon matters covered by the attorney-client privilege. At this juncture, Wing asked Parkinson to telephone Mr. Stans and inquire if Stans were willing to waive the privilege. Parkinson called Stans and reported that Stans wanted to consider the matter before making a decision. As the interview progressed, Parkinson answered several questions by referring to a file of handwritten and typed notes that he had brought with him. At the close of the interview, Wing asked Parkinson to give him the file. Parkinson removed from the file those papers he considered to be privileged and permitted Wing to copy the remaining documents. The copies were retained by Mr. Wing.

On the afternoon of May 4, 1973, Parkinson testified before a Grand Jury. He did not, however, testify before the Grand Jury that subsequently returned the indictment, nor was his testimony read to the indicting Grand Jury.[3] Information obtained from Parkinson was used in the questioning of defendant Sears before the indicting Grand Jury on May 8, 1973.

■■■ The defendant Stans argues that the actions of the Government in relation to Parkinson constituted a forbidden invasion of the attorney-client privilege and/or the work product rule. Our examination of the testimony and documents concerned leads us to conclude that the attorney-client privilege was not violated by the Government's conduct. However, we find that this conduct constituted an unjustifiable intrusion into matters protected by the work product rule.

■■■ Without detailing the content of the documents in question, we can describe them as falling into two categories: first, statements prepared by Stans for use by Parkinson in connection with pending civil litigation;[4] second, notes made by Parkinson following interviews with various third parties. Beyond question, these documents are the result of the attorney's investigation and preparation of his client's case. The fact that they are not within the technical scope of the attorney-client privilege does not render them amenable to examination and use by the prosecutor. In re Terkeltoub, 256 F.Supp. 683 (S.D.N.Y.1966). In *Terkeltoub*, the Government sought to compel an attorney to testify before the Grand Jury concerning a meeting among the attorney, his client and a third party. The meeting was held in preparation of the client's case for trial. In deciding that the attorney's testimony could not be compelled, Judge Frankel stated, "[t]he ultimate interest to be protected is the privacy and confidentiality of the lawyer's work in preparing the case" and concluded that, "[t]he prosecution's secret intrusion [into this area] offends both the Fifth and Sixth Amendments." *Id.* at 685. We find the Government's efforts to distinguish *Terkeltoub* on the basis of compelled versus voluntary testimony unpersuasive.[5] It is clear that an attorney is "not only entitled, but

---

3. It appears that a total of three Grand Juries participated in the investigation. On days when the indicting Grand Jury was not in session, witnesses were taken before one of the subsidiary Grand Juries. At a later date, their testimony was read before the indicting Grand Jury.

4. These statements having been revealed to third parties during the course of Parkinson's investigation were not covered directly by the attorney-client privilege.

5. Equally unpersuasive is the defendant's attempt to convince the court that Parkinson's testimony was, in fact, compelled. This attempt is based upon Rayhill's statement that Parkinson would be making a "tragic mistake" if he did not tell the truth. The defendant views this statement as a threat

probably required, to withhold" such testimony. *Id.* at 684. The decision to "volunteer" information of this nature rests with the client. Parkinson's erroneous conclusion that the information could not be withheld can in no way be imputed to Mr. Stans nor can the "fruits" of that conclusion be used to the detriment of the defendant.[6]

Having determined that the Government's conduct in relation to Parkinson constituted a violation of the defendant's Fifth and Sixth Amendment rights, we reach the question of the consequences of that conduct. By an accident of fate, Parkinson's testimony never reached the ears of the indicting Grand Jury.[7] Parkinson's testimony was used in questioning the defendant Sears before the indicting Grand Jury on May 8, 1973. This series of questions constituted a minute and not especially significant portion of an extensive Grand Jury investigation. Moreover, the Grand Jury was subsequently warned to disregard any mention of Parkinson in the Sears' testimony.[8] Under these circumstances a finding that the indictment was "tainted" by the Government's unfortunate and ill-advised excursion into the realm of the work product rule would be totally unjustified. The motion to dismiss the indictment is, therefore, denied. The motion to suppress is granted. The Government is directed to return to Mr. Parkinson all copies of the documents in question, forthwith. The copies of these documents in the court's possession shall remain sealed and shall be retained as a part of the record of these proceedings.

*Prosecutorial Misconduct*

The defendants Mitchell and Stans move to dismiss the indictment because of alleged Government misconduct both during the course of the Grand Jury proceedings and immediately following the return of the indictment. In support of their motion, the defendants rely on three incidents of alleged misconduct: 1) references by the Assistant United States Attorney to "Watergate" during the interrogation of defendant Mitchell before the Grand Jury; 2) a New York Times article ascribed to "sources close to the investigation" and headlined "INDICTMENT OF MITCHELL, STANS AND VESCO IS EXPECTED TODAY IN POLITICAL-GIFT CASE"; and 3) remarks by the then United States Attorney Whitney North Seymour, Jr. at a press conference announcing the indictment. We find that these incidents neither individually nor cumulatively justify the relief requested.

■ On March 20, 1973, defendant Mitchell appeared before the Grand Jury investigating the so-called "Vesco" case. During the course of that appearance, the defendant was asked a series of eight questions containing references to the Watergate burglary.[9] The defendant contends that these questions were both prejudicial in their reference to

---

of Government action and possibly of indictment. However, Parkinson's testimony indicates that although he was concerned by this attack on his veracity, he was not in any way intimidated by Rayhill's statement.

6. This statement is in no way intended to reflect upon Mr. Parkinson's competence as an attorney or his conduct in this matter. It is clear that at the time of the events under examination, neither Mr. Parkinson nor the Assistant United States Attorney were cognizant of the *Terkeltoub* decision and its possible consequences. We find unequivocally, that Mr. Parkinson turned over the documents in question believing there were no valid grounds for withholding them.

7. The indicting Grand Jury was not in session on the day Mr. Parkinson testified. See n. 3, *supra.*

8. It appears that this warning, referred to by the Government as "an exercise of over-caution" was prompted by a complaint by Mr. Barker (Stans' attorney) concerning the propriety of the Government's conduct vis-a-vis Parkinson. The complaint also forestalled the reading of Parkinson's testimony before the indicting Grand Jury.

9. The specific questions alleged to have been improper are:

Q. During any of the meetings in June or July [1972], did you have any conversations with Sears relating to the recent Watergate arrest?

"Watergate" and irrelevant to the matter before the Grand Jury. The Government argues that reliance on so brief and isolated a portion of an extensive Grand Jury investigation cannot support dismissal of the indictment.[10] We agree with the Government's contention. United States v. Nunan, 236 F.2d 576 (2d Cir. 1956). Perhaps of greater importance is the Government's contention that these questions were indeed relevant to the matter before the Grand Jury. In support of this contention, the Government has submitted to the court a sealed affidavit explaining the rationale of these questions. Having reviewed this affidavit, we are satisfied that the questions posed were sufficiently relevant to the existing posture of the Grand Jury investigation to justify the inquiry,[11] and did not constitute an instance of prosecutorial misconduct.

■ The second alleged incident of prosecutorial misconduct concerns a New York Times article of May 10, 1973. The article bore the headline "INDICTMENT OF MITCHELL, STANS AND VESCO IS EXPECTED TODAY IN POLITICAL-GIFT CASE" and cited "sources close to the investigation."

the defendants contend that this article evidenced a forbidden "leak" of information by the prosecutor and had a prejudicial impact upon the Grand Jury. Addressing first the claim of a "leak" of information, we find nothing in papers before the court to substantiate this claim or to justify the defendants' request for an evidentiary hearing. *See* United States v. Sweig, 316 F.Supp. 1148 (S.D.N.Y.), aff'd, 441 F.2d 114 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1970). The defendants' claim is analogous to that made in United States v. Kahaner, 204 F.Supp. 921 (S.D.N.Y.1962), aff'd, 2 Cir., 317 F.2d 459 (1963). As in *Kahaner* the defendants base their argument on "inferences drawn from . . . newspaper articles which attributed their source to unidentified 'officials.'" *Id.* at 922. The opposing affidavit of Assistant United States Attorney James W. Rayhill is also similar to that submitted in *Kahaner*. In his affidavit, Mr. Rayhill unequivocally denies that that the Government disclosed any information to the press. The affidavit is replete with references to the efforts undertaken to maintain the secrecy of

---

A. No, sir.

Q. Do you know Mr. E. Howard Hunt, Jr.?

A. No sir, I do not, surprisingly enough, other than by his fame of newspapers. Never met the gentleman.

Q. Do you know a man named Frank Sturges?

A. No sir.

Q. Directing your attention to roughly April of 1972, do you recall an occasion on which you were in the Waldorf Astoria Hotel during that month?

A. April, April, April. I don't know. I have to check my records. I believe I spoke at some National Republican woman's organization there in the spring of 1972. What other occasions I might have had there, I don't know. I don't recall any other.

Q. Were you ever in a room called the Peacock Room at the Waldorf during April?

A. Is that a public room?

Q. I believe so.

A. Not to my recollection.

Q. Did you ever meet with a man named Howard Hunt and Donald Segretti in the Waldorf in April, 1972?

A. You must be kidding. I most certainly did not. I testified previously I've never met either one of them in my life.

10. At the defendants' request the court undertook an *in camera* examination of the Grand Jury testimony. Our examination revealed no further references to "Watergate."

11. It is important to remember that these questions were posed nearly two months before the indictment was returned. At that time, the Government could not have known with any degree of certainty how the investigation would develop, what form the indictment would take, or whether an indictment would be returned. It would be ludicrous to conclude that because a question may not be relevant in the context of the ultimate indictment, it could not have been relevant when asked. The precise issue of the relevancy of this line of questioning to the instant indictment is raised by the defendants' motion to strike portions of the Bill of Particulars and will be dealt with in our discussion of that motion.

**1248**

the proceedings.[12] Thus it is stated that "only five Assistant United States Attorneys knew the details of the investigation" and that "Assistant United States Attorneys not directly working on the case were asked not to enquire about the case . . . ." (Rayhill affidavit at 13). "No outside investigative agency was involved" in the proceedings and "[t]he grand jurors were continually reminded of their oath of secrecy." *Id.* In the face of this categorical denial by the Government, the defendants' conclusory allegations of a "leak" cannot support a dismissal of the indictment. United States v. Sweig, *supra*; United States v. Kahaner, *supra*.

■ Turning briefly to the question of the possible prejudicial impact of the Times article on the Grand Jury, we note that prior to its vote the Grand Jury was specifically advised to "disregard any newspaper articles and confine their decision on an indictment solely on (*sic*) the evidence before them." (Rayhill affidavit at 12). The defendants' conclusory allegation of prejudice cannot outweigh the "strong presumption of regularity accorded to the deliberations and findings of grand juries." United States v. Kahaner, *supra*, 204 F.Supp. at 923. *See* United States v. Nunan, 236 F.2d 576 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); United States v. Weber, 197 F.2d 237 (2d Cir.), cert. denied, 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952).

■ The final incident of alleged prosecutorial misconduct concerns the remarks by the then United States Attorney Whitney North Seymour, Jr. at a press conference announcing the indictment.[13] In his opening comments, Mr. Seymour stated, "This is a sad day in a series of sad days for those of us who are concerned about integrity in

government and in the administration of justice." We view this statement as being more an instance of misjudgment than misconduct. While we think it a "sad day" whenever a prosecutor sees fit to comment on a pending case in any but the most circumspect fashion, we do not read Mr. Seymour's remarks as tantamount to an expression of "opinion as to the accused's guilt" in violation of Local Rule 8. Moreover, taken in its proper context, the press conference cannot be interpreted as an attempt by the Government to create the "carnival atmosphere" denounced in Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). *See* United States v. Pfingst, 477 F.2d 177, 186 (2d Cir. 1973). The motion to dismiss the indictment by reason of alleged prosecutorial misconduct is, accordingly, denied.

*Target Warnings*

■ The defendants move to dismiss the indictment on the grounds that the Government failed to advise them that they were the "target" of the investigation, prior to their appearance before the Grand Jury. The motion is without merit and is denied. At the time of the defendants' initial appearance before the Grand Jury "it was not at all clear that [either] of them would be a defendant. . . ." (Wing affidavit at 2). Put simply there was no "target." Moreover, the defendants were given the customary *Miranda* warnings prior to their appearances before the Grand Jury. "If these warnings are adequate to protect a defendant in the hostile environment of custodial interrogation they are surely sufficient with a witness appearing before a grand jury. . . ." United States v. Binder, 453 F.2d 805, 810 (2d Cir. 1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2458, 32 L.Ed.2d 805 (1972). *See*

12. The Rayhill affidavit includes an extensive paragraph-by-paragraph examination of the Times article in an attempt to demonstrate the possible sources of the information. While we find this examination of some interest, we note that it is equally as specula-

tive as the defendants' conclusion of a Government leak.

13. To the extent that these remarks constitute an example of pretrial publicity, they will be examined in the portion of our opinion specifically addressed to that problem.

United States v. Potash, 332 F.Supp. 730 (S.D.N.Y.1971).

## II—SUFFICIENCY AND STRUCTURE OF THE INDICTMENT

### The Obstruction of Justice Charges

The defendants move to dismiss Counts 2, 3 and 4 (the substantive obstruction of justice counts) and a substantial portion of count 1 (the conspiracy count) for failure to state an offense within the purview of 18 U.S.C. §§ 1503, 1505, 1510 and 371.

### A—Counts 2, 3 and 4

Counts 2 charges the defendants with violating 18 U.S.C. § 1503[14] by endeavoring to obstruct justice "in connection with an S.E.C. investigation of and subsequent legal proceedings against Robert L. Vesco, I.C.C., I.O.S. and others." Count 3 charges the defendants with violating 18 U.S.C. § 1505[15] by endeavoring to obstruct the due administration of "the federal securities law and related statutes, under which a proceeding was then being held before . . ." the S.E.C. Count 4 charges the defendants with violating 18 U.S.C. § 1510[16] by endeavoring "to obstruct, delay and prevent Robert L. Vesco, Harry L. Sears, Richard Clay, Laurence B. Richardson, Shirley Bailey, Helen Force and other persons from communicating

14. Section 1503 provides that:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States magistrate or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

15. Section 1505 provides that:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before any department or agency of the United States, or in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress; or

Whoever injures any party or witness in his person or property on account of his attending or having attended such proceeding, inquiry, or investigation, or on account of his testifying or having testified to any matter pending therein; or

\* \* \* \* \*

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which such proceeding is being had before such department or agency of the United States, or the due and proper exercise of the power of inquiry under which such inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

16. Section 1510 provides that:

(a) Whoever willfully endeavors by means of bribery, misrepresentations, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; or

Whoever injures any person in his person or property on account of the giving by such person or by any other person of any such information to any criminal investigator—

Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(b) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

information relating to criminal violations of the federal securities laws to attorneys and investigators duly authorized by the Securities and Exchange Commission to engage in investigations of criminal violations of the securities laws." The defendants contend that specific conduct alleged to have been the means by which these forbidden endeavors were to be accomplished does not come with the ambit of activity proscribed by the obstruction of justice statutes.

In support of this contention the defendants have presented the court with a mathematically exact examination of the indictment in an effort to demonstrate its insufficiency. In so doing, they have overlooked one vital point; that is that in law, unlike in mathematics, the whole may indeed be greater than the sum of its component parts. The first element of the defendants' equation is directed at the obstruction of justice statutes, 18 U.S.C. §§ 1503, 1505 and 1510. The defendants contend that these statutes are mutually exclusive as to chronological application. They reason that § 1510 applies solely to conduct prior to the commencement of the S.E.C. proceeding on March 18, 1971; that § 1505 applies solely to conduct during the pendency of the S.E.C. proceeding but prior to the commencement of the judicial proceeding on November 27, 1972; and, that § 1503 applies solely to conduct during the pendency of the judicial proceeding. Applying their tripartite analysis to the so-called "means" paragraph of the indictment,[17] the defendants conclude that count 4 which charges a violation of § 1510 must be dismissed because of the failure to allege any specific conduct prior to March 18, 1971 and that counts 2 and 3 which charge violations of §§ 1503 and 1505, respectively, must be dismissed because the specific conduct alleged during the applicable time periods was not illegal.

■ Initially, we agree with the defendants' construction of the obstruction of justice statutes as mutually exclusive. Such a construction is, we believe, impelled by the legislative history of § 1510 and judicial interpretation of §§ 1503 and 1505. However, we do not accept the conclusion that this construction, when applied to the indictment, mandates the dismissal of any of the substantive counts at this juncture.

Section 1510 was enacted to "plug a loophole in the protection the Government [could] provide to its own witnesses and informants." H.R.Rep.No.658, 90th Cong., 1st Sess., 1967 U.S.Code & Admin.News pp. 1760, 1761. Prior to the enactment of this section it was not a crime to obstruct a criminal investigation or inquiry before the initiation of proceedings within the scope of §§ 1503 or 1505. *Id.* at 1967 U.S.Code & Admin.News p. 1760; United States v. Metcalf, 435 F.2d 754 (9th Cir. 1970); United States v. Scoratow, 137 F.Supp. 620 (W.D.Pa.1956). Once either judicial, agency or congressional proceedings were commenced, the decisions interpreting §§ 1503 and 1505 brought potential and intended as well as actual witnesses within the protective ambit of the statutes. *See, e. g.,* Hunt v. United States, 400 F.2d 306 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L. Ed.2d 566 (1969); Stein v. United States, 337 F.2d 14 (9th Cir. 1964), cert. denied, 380 U.S. 907, 85 S.Ct. 889, 13 L. Ed.2d 795 (1965); United States v. Grunewald, 233 F.2d 556 (2d Cir. 1956), rev'd on other grounds, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); Odom v. United States, 116 F.2d 996 (5th Cir.), rev'd on other grounds, 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511 (1941); Smith v. United States, 274 F. 351 (8th Cir. 1921).[18] Section 1510 was intended to

---

17. Count 1, paragraph 16.

18. In Smith v. United States, the court defined the term "witness" as used in the statute to include: "those who are subpoenaed to come, . . . those who are called and accept the call to come without subpoenas, . . . those who are prompted to come by their interests, . . .

reinforce and expand the existing statutory structure by applying criminal sanctions to interference with the criminal investigative process. H.R.Rep.No.658, 90th Cong., 1st Sess., 1967 U.S.Code & Admin.News pp. 1760–1763. Once judicial, agency or congressional machinery was set into operation, the broad definition given by the courts to the term "witness" as employed in §§ 1503 and 1505 obviated the need for any additional protection. To construe §§ 1503, 1505 and 1510 as being co-extensive rather than mutually exclusive would create a statutory redundancy not intended by the legislative history or judicial precedent. By their explicit terms the statutes are applicable to different governmental activities as well as separate chronological periods; to extend their scope in this fashion would be to contravene the rule that criminal statutes are to be strictly construed. Haili v. United States, 260 F.2d 744 (9th Cir. 1958). *See generally* United States v. Berger, 338 F.2d 485 (2d Cir. 1964), cert. denied, 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1965); United States v. Norton, 179 F.2d 527 (2d Cir. 1950); United States v. Birrell, 266 F.Supp. 539 (S.D.N.Y. 1967).

■ Construing the obstruction of justice statutes as mutually exclusive does not, as previously stated, require a dismissal of counts 2, 3 or 4 of the Indictment. Each of these counts contains two paragraphs. The first paragraph of each of these counts charges the defendants with violating §§ 1503, 1505 and 1510, respectively, in purely statutory language. The second paragraph of each of these counts incorporates by reference the allegations of the so-called "means" paragraph of count 1. In their analysis of the indictment, the defendants concentrate on the alleged "means."

■ The defendants contend that to constitute a violation of the obstruction of justice statutes the conduct alleged must be *"per se* illegal in and of itself." (Mitchell Memorandum In Support of Motion to Dismiss Obstruction of Justice Charges at 7.) They present the court with an extensive catalogue of conduct that in other cases has been held sufficient to constitute an endeavor to obstruct justice, *e. g.,* bribery, subornation of perjury, falsification of documents, threats of violence, intimidation and fraud. In the absence of such *per se* illegality the defendants contend that "a violation cannot be made out regardless of . . . the motive which precipitated the conduct." *Id.* (Emphasis added.) This conclusion was rejected by the court in United States v. Polakoff, 121 F.2d 333 (2d Cir. 1941). *Polakoff* involved attempts by a bail bondsman to "influence [an] Assistant District Attorney . . . to recommend a reduced sentence [for one Kafton]." *Id.* at 334. Ostensibly Polakoff was attempting to do a favor for a "local politician"; in reality he was being paid for his efforts by Kafton.[19] The court in *Polakoff* was thus faced with the question of whether "a corrupt endeavor to obstruct justice . . . requires an attempted debauching of [an] official, and not merely *a use of otherwise legitimate arguments for concealed or falsified ends."* *Id.* at 333. (Emphasis added.) The court held that Polakoff's efforts to influence justice for concealed motives constituted a corrupt endeavor within the meaning of the statute. The allegations that the defendants herein endeavored to influence the proceedings against Vesco while concealing the purported reasons for that endeavor fall squarely within the holding in *Polakoff*. *See* Cole v. United States, 329 F.2d 437, 443 (9th Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); Craig v. United States, 81 F.2d 816, 822 (9th Cir.), cert. denied, 298 U.S. 637, 56 S.Ct. 670, 80 L.Ed. 1371 (1936).

those who expect to come, and . . . those who are selected and expected to come to testify in any case in any court of the United States . . . . " 274 F. at 353.

19. Kafton in turn was a Government informer and he immediately reported the defendant's overtures. 121 F.2d at 334.

*Cf.* United States v. Alo, 439 F.2d 751, 754 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971). Moreover, in their analysis of the indictment the defendants ignore what they refer to as the "generic" allegations. Yet, it is these "generic" allegations that are the core of the indictment and the measure of its sufficiency. United States v. Spada, 331 F.2d 995 (2d Cir.), cert. denied, 379 U.S. 865, 85 S.Ct. 130, 13 L.Ed.2d 67 (1964); United States v. Cimino, 321 F.2d 509 (2d Cir. 1963), cert. denied, sub nom. D'Ercole v. United States, 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964); United States v. Palmiotti, 254 F.2d 491 (2d Cir. 1958); United States v. Weisscredit Banca, 325 F.Supp. 1384 (S.D.N.Y. 1971).

Fundamentally, the defendants' motion presents the court with the somewhat unusual premise that an indictment charging the essential elements of an offense in statutory language can be rendered insufficient by the inclusion of allegations of specific conduct. The fallacy of this premise is found in an examination of the function of an indictment.

▮▮▮ An indictment is an instrument of accusation, not of proof. Ultimately, the "test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'" Hagner v. United States, 285 U.S. 427, 431, 52 S. Ct. 417, 419, 76 L.Ed. 861 (1932), quoting Cochran and Sayre v. United States, 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704 (1864). *See* United States v. Silverman, 430 F.2d 106, 110 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); Hunt v. United States, 400 F.2d 306, 308 (8th Cir.), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1968). Clearly, the indictment under examination meets this settled test of sufficiency.

The defendants contend that because the Government has "[gone] beyond reliance upon generic allegations . . . and set forth in some detail the ways and means by which the government claims the alleged criminality was accomplished . . . the Court must consider . . . in determining the sufficiency of the indictment, the ways and means . . . recited . . . ." (Mitchell Reply Memorandum In Support of Motion to Dismiss Obstruction of Justice Charges at 2). In support of this contention the defendants rely upon the decision of Judge Wyatt in United States v. Bayley, 63 Crim. 307 (S.D.N.Y. July 8, 1964). Such reliance is misplaced.

An examination of Judge Wyatt's opinion in *Bayley* is illustrative of the difference between the question of the sufficiency of an indictment and the question of the sufficiency of proof. *Bayley* involved a motion to dismiss certain counts of an indictment charging the making of "false, fictitious or fraudulent statements or representations" in violation of 18 U.S.C. § 1001 for failure to state an offense. In its memorandum in opposition to the motion, the Government conceded that its proof would consist of a showing that "the defendant [had] cashed refund checks to which he was not entitled. . . ." *Id.* at 4, quoting Government Memorandum of Law at 5. It was further conceded that neither the endorsements nor the checks themselves were forged. *Id.* at 5. In granting the defendant's motion Judge Wyatt stated:

[W]here the facts are agreed on both sides and it is then clear that the indictment, read in the light of the agreed facts, is defective, the normal rule should not be followed but the indictment should be dismissed. *Id.* (Citations omitted.)

The circumstances of the instant case are the antithesis of those in *Bayley*. In *Bayley*, "both sides [asked] the Court to pass on the point in controversy, *regardless of the technical sufficiency of the indictment*." *Id.* at 6. (Emphasis added.) In the case at the bar, the Government, while maintaining that the allegations of the "means" paragraph do in fact constitute a claim of obstruction of justice, relies on the technically sufficient statutory allegations of the indictment. The Government contends that the Court must give consideration to the total indictment and not merely isolated sections.[20] We think this cotention is sound.

In accordance with the foregoing, we find that given their fair and complete reading, counts 2, 3 and 4 of the indictment charge the defendants with a corrupt endeavor to obstruct justice in relation to the S.E.C. investigation of and subsequent agency and judicial proceedings against Robert L. Vesco. Any other conclusion would require us to equate the individual allegations of the "means" paragraph of the indictment with the entirety of the Government's proof and would, in reality, transform this Rule 12(b)2 motion into a motion for acquittal pursuant to Rule 29. Such a venture into the realm of prognastication and alchemy is beyond the province of this court.

### B–*Count 1*

Our decision on the motion to dismiss that portion of the conspiracy count charging a conspiracy to defraud the United States with respect to the proper functions of the S.E.C. and a conspiracy to violate 18 U.S.C. §§ 1503, 1505 and 1510, is in large measure dictated by our preceding discussion of the substantive counts of the indictment.

The defendants' argument with regard to the count charging conspiracy to obstruct justice is inextricably related to their assault on the substantive counts of the indictment. The defendants contend that inasmuch as the specific conduct alleged in the "means" paragraph would not constitute a violation of the obstruction of justice statutes, a conspiracy to violate those statutes could not have existed. In support of this contention the defendants rely upon an analysis of isolated allegations of count 1, disregarding the so-called "generic" language. The inadequacy of this approach as applied to the substantive counts of the indictment has been amply demonstrated. *Supra* at 1251–1253. Its application to the conspiracy count is even less persuasive. An indictment charging the essential elements of a conspiracy need not allege with particularity the means by which the substantive crime alleged to be the object of the conspiracy was to be accomplished.[21] *See* Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); Williamson v. United States, 207 U.S. 425, 449, 28 S.Ct. 163, 52 L.Ed. 278 (1909); Schino v. United States, 209 F. 2d 67 (9th Cir.), cert. denied, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1954); United States v. De Sapio, 299 F.Supp. 436 (S.D.N.Y.1969); United States v. Gilboy, 160 F.Supp. 442, 452 (M.D.Pa. 1958); *cf.* United States v. Messina, 481 F.2d 878 (2d Cir. 1973). The allegations of count 1 with regard to a conspiracy to violate §§ 1503, 1505 and 1510 are clearly sufficient, and the motion to dismiss that portion of the indictment must, therefore, be denied.

---

20. In structure and content the "means" paragraph of the indictment is not unlike a bill of particulars. As a general rule the sufficiency of an indictment is not strengthened or weakened by a bill of particulars. *See, e. g.,* United States v. Comyns, 248 U.S. 349, 353, 39 S.Ct. 98, 63 L.Ed. 287 (1919); United States v. Seeger, 303 F.2d 478, 485 (2d Cir. 1962); United States v. Lamont, 236 F.2d 312, 315 (2d Cir. 1956). While we recognize the obvious and important differences between a portion of an indictment and a bill of particulars, we cannot ignore the aptness of the analogy.

21. In addition, it should be noted that the instant indictment describes not all but only "some of the means" of the alleged conspiracy.

## 1254

With regard to the allegations of a conspiracy to defraud the United States in relation to the lawful functions of the S.E.C., the defendants contend that conduct set forth in the indictment does not constitute a violation of 18 U.S.C. § 371. We find this contention to be without merit.

 Read in its entirety, count 1 charges that the defendants agreed to impair the S.E.C. investigation of Vesco in return for a cash contribution to the Committee for the Re-election of the President. The defendants argue that the conduct alleged does not come within the "deceit, craft, trickery or dishonest means" standard of Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S. Ct. 511, 68 L.Ed. 968 (1924). We disagree. The scheme alleged in the indictment before the court is analogous to that in United States v. Sweig, 316 F. Supp. 1148 (S.D.N.Y.), aff'd, 441 F.2d 114 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1970). In Sweig, the defendants were charged with agreeing to take "fees from people with matters before government agencies in exchange for undertaking 'to exert the influence of the office of the Speaker of the House to said agencies.'" Id. at 1155. In holding that such activity was within the scope of Hammerschmidt, Judge Frankel stated:

> the taking of . . . payments by one purporting to act for an official, plus the promise to exert improper pressures upon other officials, comes within the ban against schemes "to interfere with or obstruct . . . lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." Id. at 1156.

We find that the alleged efforts of the defendants to influence the lawful functions of the S.E.C., while concealing the purported motive for those efforts, to be within the range of activities proscribed

by 18 U.S.C. § 371, and accordingly, we deny the motion to dismiss the portion of the indictment charging a violation of that statute.

### The Severance Motions

The defendants Mitchell and Stans have made a total of three severance motions seeking variously to sever defendant Sears, defendant Vesco and certain counts of the indictment. The motion to sever defendant Sears has been consented to by the Government under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and is, accordingly, granted. The remaining motions are before the court for consideration and decision.

### A—The Severance of Vesco

The defendants by this motion pursuant to Rule 8 and Rule 14, Fed.R.Crim. P., seek a severance of the trial of their case from that of defendant Vesco.[22] The defendants proceed on the theory that the indictment charges two separate conspiracies: 1) a conspiracy to "kill" the S.E.C. investigation into the financial affairs of Vesco and I.O.S.; 2) a conspiracy to conceal the contribution by Vesco to the Committee for the Re-election of the President. The Government contends that the indictment alleges a single conspiracy having as its object "the attempt to quash the S.E.C. investigation in return for the $200,000 cash contribution, and the attempt to avoid disclosing the facts relating to the contribution." (Government's Memorandum of Law in Opposition to the Motion at 3.) Our reading of the indictment is in accord with the Government's contention.

 Fundamentally, the question of whether the defendants are charged with a single conspiracy having multiple objects or with distinct multiple conspiracies cannot be properly answered until the development of the Government's

22. Essentially what the defendants seek is a severance of proof. As a practical matter, the need for a formal motion to sever the

defendant Vesco himself is obviated by his continued absence from the jurisdiction of this court.

proof at the time of trial.[23] *See* United States v. Cirillo, 468 F.2d 1233 (2d Cir. 1972); United States v. Projansky, 465 F.2d 123 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); United States v. Bennett, 409 F.2d 888 (2d Cir.), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); United States v. Agueci, 310 F.2d 817 (1962), cert. denied, 372 U.S. 959, 83 S. Ct. 1013, 10 L.Ed.2d 11 (1963). While we agree with defendants' argument that an indictment manifestly charging separate conspiracies would require a departure from this fundamental proposition, we find nothing in the indictment under examination to justify such a departure. On its face the indictment alleges a single conspiracy; the fact that the conspiracy may be alleged to have had multiple purposes does not render the indictment defective. Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942). The motion is premature and is, therefore, denied.

### B—*Severance of the Perjury Counts*

Defendants Mitchell and Stans move to sever counts 5 through 16 (the perjury counts) on the grounds of misjoinder under Rule 8(b), Fed.R.Crim.P. and prejudicial joinder under Rule 14, Fed. R.Crim.P.

The defendants contend that absent a charge of conspiracy to commit perjury, the joinder of a perjury charge in a multi-defendant indictment is proscribed by Rule 8(b).[24] The applicable decisions in this Circuit do not support this contention. In re Gottesman, 332 F.2d 975 (2d Cir. 1964); United States v. Sweig, 316 F.Supp. 1148 (S.D.N.Y.), aff'd 411 F.2d 114 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1970); United States v. Cohn, 230 F.Supp. 587 (S.D.N.Y.1964); United States v. Haim, 218 F. Supp. 922 (S.D.N.Y.1963); United States v. Verra, 203 F.Supp. 87 (S.D.N.Y.1963); *cf.* United States v. Granello, 365 F.2d 990 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967).[25] It is not required that a conspiracy to commit perjury be charged in order to establish the necessary nexus between the alleged conspiracy and the subsequent alleged perjury. It is sufficient if "a direct connection [exists] between each of the perjury charges and one or more of the overt acts connected with the conspiracy count." United States v. Sweig, *supra*, 316 F.Supp. at 1158. In the case at the bar, the Government has adequately demonstrated a connection between each of the alleged perjury counts and the alleged objects or means of the conspiracy.[26] We find,

---

23. The defendants rely upon United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed. 2d 555 (1965). In *Borelli*, the court based its finding upon a review of the Government's evidence as adduced at trial. The defendants by this motion invite the court not to review an existing record but to speculate on evidence as yet undeveloped. We must respectfully decline their invitation.

24. Rule 8(b) provides that:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

25. In *Granello*, the court declined the opportunity to limit the decision in *Gottesman*, choosing instead to base its holding on the fact that the alleged joint conduct did not constitute an offense. 365 F.2d at 995.

26. For example, count 7 of the indictment charges that the defendant Mitchell's answers to the following series of questions were perjurious:

Q. But before that happened, did he call you and tell you that Vesco had gotten a subpoena?

A. Not to my recollection.

Q. Did he call you and tell you that Vesco was going to blow the whistle on the contribution and tell everything about it unless he could get the subpoena withdrawn?

A. Harry Sears tell me that?

Q. Yes.

A. No, sir.

therefore, that a severance under Rule 8(b), Fed.R.Crim.P. is not mandated by the structure of the indictment.[27] Having found that there is no misjoinder, we turn to the question of prejudicial joinder.

■■ A motion pursuant to Rule 14 is addressed to the discretion of the court. United States v. Falange, 426 F. 2d 930 (2d Cir.), cert. denied, 400 U.S. 906, 91 S.Ct. 149, 27 L.Ed.2d 144 (1970); United States v. Garber, 413 F.2d 284 (2d Cir. 1969). Put simply, a Rule 8(b) motion asks: Must there be a severance as a matter of law? A Rule 14 motion asks: May there be a severance as a matter of judicial discretion? In exercising this discretion, we recognize the soundness of the Government's contention that its proof on the conspiracy count is substantially identical to its proof on the perjury count and that, therefore, a severance will result in an unnecessary duplication of effort. Additionally, we note that even if the perjury counts were severed "the allegedly perjurious statements would be admissible on the trial of the conspiracy count as assertedly false exculpatory statements." United States v. Sweig, *supra*, 316 F. Supp. at 1158. *See* United States v. Corallo, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 437, 24 L.Ed.2d 422 (1969); United States v. Verra, *supra*, 203 F.Supp. 87. Thus, in reality a severance would only result in a bifurcated trial; it would not have

the desired effect of preventing a "spillover" of possible prejudice. The most appropriate weapon available to combat any possible prejudice arising from the joint trial of these counts is a limiting instruction to the jury. In light of the foregoing considerations and in accordance with the clear line of decisional authority in this Circuit, the defendants' motion is denied.

### III—DISCOVERY

The defendants have made the full complement of discovery motions. By an earlier decision we disposed of the motions for a Bill of Particulars and for discovery and inspection pursuant to Rule 16, Fed.R.Crim.P.[28] The remaining motions for discovery of *Jencks* material, *Brady* material, non-*Brady* material favorable to the defense, *Bruton* material and Grand Jury testimony and for disclosure of electronic surveillance are disposed of herein. In addition, we address at this juncture the defendants' motions for an order striking certain portions of the Bill of Particulars and directing the Government to comply with this court's order of August 3, 1973.

■ The defendants' motions for production of *Jencks* material, *Brady* material and so-called non-*Brady* material (material defined by the defendants as including information concerning immunity, plea bargaining or any form of consideration either granted or promised

---

Paragraph 16(r) of the conspiracy count alleges that:

In October 1972, defendant ROBERT L. VESCO would and did threaten to disclose the facts surrounding the secret $200,000 cash contribution delivered to defendant MAURICE STANS on April 10, 1972, unless an S.E.C. subpoena issued to Vesco was withdrawn. In October 1972, defendant HARRY L. SEARS would and did relay Vesco's threat to defendant JOHN N. MITCHELL.

The factual relationship between these portions of the indictment is apparent. The fact that this relationship exists between the perjury counts and the "objects" or "means" of the conspiracy rather than the "overt acts" is a distinction without a difference.

27. In United States v. Charnay, 211 F.Supp. 904 (S.D.N.Y.1962), it was the absence of the logical connection supplied by a conspiracy count that rendered the joinder "beyond the permissible limits of Rule 8(b)." *Id.* at 907. In granting the defendants' motion to sever, Judge Weinfeld specifically noted that the *Charnay* case was "to be distinguished from those [cases] where perjury counts against a defendant are joined with conspiracy counts naming other defendants or where concert of action is alleged and evidence admissible to prove the conspiracy is also admissible to prove the substantive counts." *Id.* at 907, n. 18.

28. Memorandum Decision of August 3, 1973.

by the Government to its witnesses) raise the question of when not whether these materials shall be provided. The defendants contend that all these materials should be provided as a matter of pretrial discovery. With regard to *Jencks* material the Government although consenting "in most instances, to provide Jencks Act material at the close of each trial day for those witnesses whom the Government anticipates will testify the following day," contends that such material need not be provided until the conclusion of the direct examination of the witness in question. Our reading of the Jencks Act (18 U.S.C. § 3500) supports the Government's contention. *See, e. g.,* United States v. Leeds, 457 F.2d 857, 859 (2d Cir. 1972); United States v. Covello, 410 F.2d 536, 543–544 (2d Cir.), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); United States v. Birrell, 276 F.Supp. 798, 825 (S.D.N.Y.1967). Turning to the defendants' request for production of material within the scope of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), while we recognize the inherent difficulties in expecting a prosecutor to view his evidence from the perspective of a defense attorney, we must accept the Government's representation that it has no such material at this time: United States v. Cobb, 271 F.Supp. 159, 163–164 (S.D.N.Y.1967). Acknowledging that the decision in *Brady* did not create a general right of pretrial discovery, [United States v. Evanchik, 413 F. 2d 950, 953 (2d Cir. 1969)], and that in most cases a determination as to exculpatory material is not possible until "after the issues and the Government's proof have crystalized" [United States v. King, 49 F.R.D. 51, 53 (S.D.N.Y. 1970)] we rely upon the good faith of the Government's representation. However, we reject the blanket assertion "that *Brady* imposes no pretrial obligation on . . . the Government.

. . ." (Government's memorandum of law at 3). We perceive the due process implications of *Brady* as obligating the Government to disclose exculpatory information *as soon as the character of such information is recognized.* This obligation has no chronological boundaries, but applies equally to the pretrial, trial and post trial stages of a proceeding. We expect that the Government will comply with our interpretation of *Brady.* With regard to so-called non-*Brady* material, *e. g.,* information concerning "favors or deals," such information goes to the credibility of a witness and need not be disclosed until prior to each witness' testifying. *See* Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). As to the scope of the material covered, it is sufficient that the Government provide information concerning: 1) grants or promises of immunity; 2) any confirmed or tentative plea bargaining; and 3) any other consideration within the knowledge of the United States Attorney granted or promised in return for testimony. We find that the wholesale investigation of the Government bureaucracy envisioned by the defendants' definition of non-*Brady* material is, in the absence of a concrete indication that such investigation would bear fruit, unwarranted.

■■ The defendants' motion for discovery pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is denied. The *Bruton* case dealt with the use of a confession by one defendant implicating a second defendant in the context of a joint trial. Under *Bruton* the Government must elect either to request a severance or to forego the use of the confession.[29] The result of the *Bruton* decision is to require such an election, not to create a collateral right of discovery.

29. The third choice given the Government by *Bruton* is to use the statements in redacted form. Whether or not a statement can be effectively redacted is for the court to determine. If in the instant case the Government intends to introduce any such redacted statements, we would expect them to be submitted for the court's inspection at this time.

■ The defendants' motion for inspection of the Grand Jury testimony is denied. *See, e. g.,* United States v. Ruggiero, 472 F.2d 599, 605 (2d Cir. 1973); United States v. Dioguardi, 332 F.Supp. 7, 20 (S.D.N.Y.1971). Absent a showing of Government inspired silence, the refusal of prospective witnesses to discuss their testimony does not establish a particularized need.[30] *Cf.* United States v. Marth, 42 F.R.D. 432 (S.D.N.Y.1967).

■ In compliance with the defendants' motion pursuant to Schipani v. United States, 385 U.S. 372, 87 S.Ct. 533, 17 L.Ed.2d 428 (1968) and United States v. Schipani, 414 F.2d 1262 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970), the United States Attorney initiated an "all agency check" to determine if electronic surveillance had been conducted with regard to any of the defendants. Such compliance is sufficient to discharge the Government's obligations under *Schipani.* The defendants' demand that an inquiry be directed to Vesco and the Republic of Costa Rica is without merit. Equally without merit is the defendants' request that each defendant be apprised of the results of the inquiry vis-a-vis his co-defendants. *See* Alderman v. United States, 394 U.S. 165, 171–176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ The defendants' motion to strike certain portions of the Bill of Particulars raises serious issues concerning the development of the evidence at the trial of this case. The defendants contend that the Government's reply to defendant Mitchell's Demand No. 8(g)[31] is an attempt to introduce collateral and highly prejudicial evidence of the "Watergate break-in." We agree. The motion is granted, subject to an offer of proof by the Government at the time of trial.

The Government's attempt to oppose this motion on the ground that "[t]here is no statute, rule or judicial decision providing for relief by way of striking allegations from a bill of particulars" (Government memo at 2) is remarkable solely for its naivete. By whatever label, the defendants are seeking to forestall the introduction of what they view as collateral and prejudicial evidence; a view in which we concur at this juncture. In the first instance, the claim that disbursements may have been made to various parties is speculative on its face. Moreover, the relevancy of such disbursements, even if proved, is not apparent to this court. While we reserve the ultimate decision on the introduction of such evidence until the time of trial, we grant the defendants' motion at this time. In addition, we put the Government on notice that prior to the introduction of this or any other "Watergate" related evidence, the court expects that an appropriate offer of proof will be made.

The defendant Stans' motion for an order compelling the Government to respond to certain demands for particulars is clearly based on a misinterpretation of this court's order of August 3, 1973. Our order required particularization of certain information requested by defendant Stans' Requests Count I:—6 and 7. The order was not intended to grant particularization of the numerous and distinct subdivisions of those demands. Our review of the Bill of Particulars and the Supplemental Bill reveals no failure to comply.

---

30. United States v. Duffy, 54 F.R.D. 549 (N.D.Ill.1972), relied upon by the defendants has been rendered inapposite by the information provided with respect to the perjury counts in the Bill of Particulars.

31. The response in question states:
The reports were false and fraudulent in that they omitted any reference to the receipt of the secret $200,000 cash contribution of defendant Vesco on or about April 10, 1972 *or any reference to disbursements which may have been made therefrom to Frederick LaRue, G. Gordon Liddy and Herbert Porter.* (Emphasis added.)

## IV—PRETRIAL PUBLICITY

The defendants John N. Mitchell and Maurice H. Stans move pursuant to Rules 12(b) and 21(a), Fed.R.Crim.P., for dismissal of the indictment or alternatively for a change of venue or a continuance by reason of "the massive prejudicial pretrial publicity of what has come to be called the Watergate matter." [32] (Fleming affidavit at 1). Specifically, defendant Mitchell contends that the allegations of criminal activity [33] made during the Senate Select Committee hearing have exposed potential jurors to inadmissible evidence under the rule of Marshall v. United States, 360 U.S. 310, 312–313, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Mitchell argues that as a result of this exposure a substantial segment of potential jurors must be disqualified,[34] thus, depriving him of the right to a jury selected from a representative cross-section of the community. Defendant Stans contends that the indictment itself springs from the infamous fountainhead of Watergate and that the flood of publicity engulfing the "Watergate-Vesco" affair has deprived him of the right to an impartial and dispassionate jury.

### Dismissal of the Indictment

■ Although the defendants' motions to dismiss are structurally different, they share a common foundation—the publicity surrounding the Watergate affair and its potential effect on the selection of the jury in the instant case. Thus, despite the apparent differences in the defendants' approaches to this issue, both motions frame the fundamental question of whether or not there can be a fair trial of the instant charges in view of the massive pretrial publicity. Essentially, this question goes to the degree and nature of the effect of pretrial publicity on prospective jurors and cannot, we believe, be satisfactorily answered until the voir dire.

■ The soundness of this pragmatic approach to the problem of pretrial publicity has been repeatedly recognized by the rulings in this Circuit. See, e. g., United States v. Persico, 425 F.2d 1375 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); Application of Cohn, 332 F.2d 976 (2d Cir. 1964); United States v. Sweig, 316 F.Supp. 1148 (S.D.N.Y.), aff'd 441 F.2d 114 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1970); United States v. Corallo, 284 F.Supp. 240 (S.D.N.Y.1968), aff'd, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); United States v. Kahaner, 204 F.Supp. 921 (S.D.N.Y.1962), aff'd, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963); United States v. Bonanno, 177 F.Supp. 106 (S.D.N.Y.1959), rev'd on other grounds sub nom., United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960); United States v. Hoffa, 156 F.Supp. 495 (S.D.N.Y.1957). While we acknowledge that where direct prejudice is apparent the court need not wait until prospective jurors are examined, see, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Rideau v. Louisiana, 373 U.S.

---

32. Defendant Mitchell asks the court to take judicial notice of the Watergate publicity. Defendant Stans has supplemented his motion with a 2615-page multi-media exhibit containing copies of newspaper and magazine articles as well as transcripts of radio and television reports about what defendant Stans describes as "the single most publicized event in the history of this Nation—the Watergate-Vesco Affair." The court has been advised that this exhibit will be made current from time to time.

33. These public accusations include the crimes of burglary, illegal electronic surveillance, perjury and obstruction of justice.

34. Parenthetically, it should be pointed out that defendant Mitchell contends that the jurors thus excluded are the very jurors who by virtue of their civic interest and awareness of current events would normally be considered best qualified to serve.

723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, *supra,* our analysis of the publicity in this case does not warrant a departure from the pragmatic approach.

Beyond cavil, the massive publicity concerning the Watergate scandal is unprecedented even in our era of mass media and instant communication. However, while massive, the publicity has not reflected the vituperative and vitriolic press found in Sheppard v. Maxwell, *supra.* The "carnival atmosphere" of *Sheppard* was the result of extremely inflammatory publicity directed specifically at the guilt of the defendant for the offense to be tried. Newspaper articles bearing such headlines as "WHY ISN'T SAM SHEPPARD IN JAIL" directly asserted the defendant's guilt and demanded his arrest. Details of allegedly damaging evidence appeared daily in the press. The trial itself was an Orwellian nightmare. During the course of the voir dire and the trial, the jury was constantly reminded of the publicity by the presence of reporters at a special table set up in the area traditionally reserved for counsel. The jury was not sequestered during the trial but was repeatedly exposed to publicity calling Sheppard a "Bare-faced Liar" and describing irrelevant and prejudicial details of the defendant's private life. Clearly, the Watergate publicity does not possess these characteristics. More importantly, the question of Watergate *per se* is not relevant to and should not be equated with the issues raised by the indictment in this case.

The filing of the indictment and the subsequent proceedings in this case have, thus far, generated a predictable and rather limited amount of publicity. The return of the indictment was announced at a press conference by the United States Attorney; subsequent court appearances by defense counsel and periodic filing of motions have been noted in the press. This publicity is in no way remarkable. The indictment and

trial of former public officials is intrinsically a newsworthy event; cases involving public figures will invariably attract publicity "no matter what date is set for trial, and no matter where tried. . . . " United States v. Corallo, *supra,* 284 F.Supp. at 242. *See also* United States v. Hoffa, *supra,* 156 F.Supp. at 500.

■ The mere existence of publicity before trial does not trigger an automatic dismissal or continuance. *See* United States v. Kahaner, *supra,* 204 F.Supp. at 924. Addressing itself to the question of pretrial publicity and jury selection, the Supreme Court stated:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Irvin v. Dowd, *supra,* 366 U.S. at 722–723, 81 S.Ct. at 1642. (Citations omitted.)

Clearly, this holding favors an inquiry of prospective jurors as to their impartiality.

■ The defendants, relying on the holding in Delaney v. United States, 199 F.2d 107 (1st Cir. 1952), contend that the nationally televised hearing before the Senate Select Committee place this case in the realm of Government-inspired publicity and that, therefore, the indictment must be dismissed. In *Delaney* the appellate court viewed as revers-

ible error the decision of the trial court denying a continuance until the effect of nationwide publicity inspired by public congressional hearings had dissipated. The hearings in question were conducted after Delaney's indictment on charges of soliciting bribes and his suspension from the office of Collector of Internal Revenue for the District of Massachusetts. The hearing focused specifically on the issues raised by the indictment, *i. e.,* the conduct of Delaney's office and his alleged corruption. Delaney's request that the hearing be conducted in executive session was denied on the basis of the overriding consideration of the public's "right to know."[35] Initially, it should be noted that although the appellate court held that a continuance should have been granted, it explicitly rejected the contention that the indictment should have been dismissed. *Id.* at 112. Moreover, despite the obvious similarities between the case at the bar and *Delaney,* there are significant and crucial distinctions. It cannot be argued that the testimony before the Senate Select Committee, either by these defendants or other witnesses, related to the charges covered by the indictment. By agreement between the Committee and the attorneys for the defendants, the subject matter of this indictment was excluded from the scope of the Committee's inquiry.[36] Admittedly, when the defendants appeared before the Senate Select Committee, the issue of their credibility was topical. However, a substantial period of time has elapsed since those appearances. During this period the spotlight of the Committee proceedings has focused on many transcendent issues that may well have captured the public eye and ear.[37]

In accordance with the foregoing analysis, we find that the issues raised by the defendants' motion cannot be adequately determined until the development of empirical information at the voir dire. Any other course would be tantamount to a futile exercise in judicial prognostication. The defendants' motions have alerted the court to the presence of possible prejudice. Thus alerted, the court will adopt appropriate measures to combat such prejudice.

*Continuance and Change of Venue*

■ The defendants contend that the most effective weapons in combatting possible prejudice are a change of venue or a continuance. Conceding that the Watergate publicity is nationwide, the defendants argue that the exposure varies in certain sections of the country. Specifically, the defendants argue that the exposure in a metropolis like New York is greater than that in small cities where mass media outlets may be limited. The same argument was explicitly rejected by the Circuit Court in Application of Cohn, 332 F.2d 976 (2d Cir. 1964). Indisputably, this case will attract publicity wherever tried; the granting of an application for a change of venue merely creates the further risks of producing a *cause celebre* in the new venue. *Id.* at 977. With regard to the motion for a continuance by reason of pretrial publicity, the anticipated trial date of September 11, 1973 comes at the end of a fortuitous lull in the activities of the Senate Select Committee and concomitant press coverage. Al-

---

35. This refusal is reminiscent of the remarks made by Senator Sam Ervin in denying a similar request by the defendants herein and Special Prosecutor Cox.

36. At one point during the testimony of defendant Stans before the Senate Select Committee a question was withdrawn and a line of inquiry terminated because of a possible relationship to the issues raised by this indictment.

37. During the more than 3½ months that the Committee has been in session, 33 witnesses have been examined in 37 days of televised hearings and more than 7,500 pages of testimony have been adduced. In the weeks prior to its adjournment, the attention of the Committee (and that of the Nation) was focused on the question of the White House tapes and the issue of their disclosure. New York Times, Aug. 8, 1973 at 1, 17, 19.

though there is little likelihood of a cessation of Watergate publicity in the foreseeable future, this temporary abatement will doubtless be of assistance in the selection of a jury.[38]

Unless a court, in its discretion, determines that "a substantially better panel can be sworn at another time or place" the motion for a continuance of trial should be denied. United States v. Bonanno, *supra*, 177 F.Supp. at 122. We conclude after consideration of all the circumstances surrounding this case that neither a change of venue nor a continuance can reasonably be expected to produce the desired result.

## V—PREPARATION FOR TRIAL

 The defendants move for an adjournment of the scheduled trial date on the basis of insufficiency of time to properly prepare their case. The motion is denied.[39] The instant indictment was returned on May 10, 1973; the trial date was set by this court on May 30, 1973. At that time, we indicated our intention of proceeding to trial at the earliest date practicable, and that the date set by the court should be viewed "as the outside date for the trial of this case." (Transcript of May 30, 1973 at 5). The instant indictment although lengthy, is not overly complex. The conspiracy charged does not possess the inherent intricacies often found in securities or tax cases.

Under the Rules of this Circuit regarding the prompt disposition of criminal cases, "[t]he district court shall grant [a defendant's request for] a continuance only if it is satisfied that postponement is in the interest of justice, taking into account the public interest in the prompt disposition of criminal charges." [Rule 5(b)]. Mindful of the strictures of this rule and having given careful consideration to the arguments made by the defendants, we must deny this motion. The trial of this case shall proceed as scheduled on September 11, 1973.

It is so ordered.

---

38. The Committee is scheduled to reconvene on September 17, 1973. Its announced intention is to complete the investigation of "Watergate" and then to commence an investigation of campaign tactics and contributions. New York Times, Aug. 29, 1973 at 21.

39. On August 9, 1973, the defendants were advised that this motion would be denied. This decision was announced in open court on August 15, 1973.