**CERTIFIED:**
to be a true and correct translation from its original

Official Court Interpreter and Translator
United States District Court
for the district of Puerto Rico

---

UNITED STATES of America and Ralph G. Neumann, Special Agent of the Internal Revenue Service, Petitioners,

v.

Harold BONNELL, as Partner of Peat, Marwick, Mitchell & Co., and Peat, Marwick, Mitchell & Co., Respondents.

UNITED STATES of America and Ralph G. Neumann, Special Agent of the Internal Revenue Service, Petitioners,

v.

Charles RICE, as Assistant Vice President of Cargill, Inc., and Cargill, Inc., Respondents.

Civ. Nos. 4–78–190, 4–78–191.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 27, 1979.

See also, D.C., 483 F.Supp. 1091.

Sheryl Ramstad Hvass, Asst. U. S. Atty., Minneapolis, Minn., for petitioners; Stephen G. Fuerth and James P. Sites, Tax. Div., Dept. of Justice, Washington, D.C., of counsel.

Boris Kostelanetz, Lawrence S. Feld, and Stuart Abrams, Kostelanetz & Ritholz, New York City, for respondents Charles Rice and Cargill, Inc.; Dorsey, Windhorst, Hanna-

ford, Whitney & Halladay, Minneapolis, Minn., of counsel.

Jeffrey R. Brooke, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for respondents Harold Bonnell and Peat, Marwick, Mitchell & Co.; Howard Krongard, Associate Gen. Counsel, Peat, Marwick, Mitchell & Co., New York City, of counsel.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

These cases present novel and difficult issues regarding the enforceability of certain tax summonses[1] issued by the Internal Revenue Service (hereinafter "the IRS"). The summonses require the production of documents and the giving of testimony by and from Cargill, Inc., Charles Rice, Assistant Vice President of Cargill, Inc., Cargill's certified public accountants, Peat, Marwick, Mitchell & Co. (hereinafter "PMM") and Harold Bonnell, a partner in PMM.

Cargill resists the enforcement of the summonses on the ground that they are predicated upon a document authored by John Levine,[2] an attorney for a Minneapolis law firm, which was obtained in a manner not authorized by Levine. Cargill argues that the document is privileged or was illegally seized and may not be used directly or indirectly by the government. Other contentions concerning due process, IRS regulations, right to counsel, and discovery are also advanced. Cargill further asserts a counterclaim in which it asks this Court to enjoin use of the questioned document in the investigation of Cargill's tax liability and to enjoin enforcement of the summonses. It also asks that the government identify the informant[3] and return all copies of the questioned document. PMM supports Cargill's position.[4]

The petitions are before this Court on objections to two reports from Magistrate J. Earl Cudd. The first report recommended that the summonses be enforced, and that the relief sought by Cargill's counterclaim be denied without prejudice. The second report specifically found that the United States government was not involved in the procurement of the questioned document.

### 1. Facts

On February 14 and 15, 1977, John Levine, head of the trial department of the Minneapolis law firm of Dorsey, Windhorst, Hannaford, Whitney & Halladay (hereinafter the "Dorsey firm") met with several persons at the request of John McGrory, general counsel for Cargill. The participants at the February meetings included two auditors from PMM and a tax attorney from Cargill's legal department. The meetings arose out of Cargill's responses to the Eleven Questions, inquiries made by the IRS in 1975 to major corporations relating to "unusual payments," whether bribes, kickbacks, political contributions, or the like. Discussed at the meetings were activities of two of Cargill's subsidiary companies: Compania Industria Y De Abastecimientos S.A. (hereinafter "Cindasa") and Piensos Hens, S.A. (hereinafter "PH").

Following the meetings, McGrory requested that Levine summarize his notes taken at the meetings in typewritten form. McGrory indicated that Levine's summary would be useful to Cargill and to Palmer Baker, New York tax counsel for Cargill. Once the typed summaries were prepared, Levine retained the original and sent a copy to the Cargill corporate offices in Minneapolis by a messenger provided by a delivery company hired by the Dorsey firm. With-

---

1. The summonses were issued pursuant to 26 U.S.C. §§ 7402(b) and 7604(a).

2. Throughout this opinion, the document authored by Mr. Levine will be referred to as the "questioned document" and the person who delivered the document to the government will be referred to as "the informant."

3. The identity of the informant, one Carl Harstad, has been disclosed by the United States government and, pursuant to an order of this Court, a hearing has been held in which the attorneys for Cargill have cross-examined Harstad. For a full description of discovery granted to respondents, see infra at 23–24.

4. Cargill has been granted leave to intervene in the proceedings against PMM.

out authority, the messenger who was to deliver the questioned document, one Carl Harstad (the informant), opened the taped envelope and examined the document in a men's room. The informant, who holds a journalism degree and is a sometime reporter, photocopied the document and proceeded to deliver the resealed envelope containing the original document to Cargill.

The informant then delivered a photocopy to a local newspaper, the *Minneapolis Star*. On March 11, 1977, Levine received a phone call from McGrory, who indicated that the *Star* had informed Cargill that the newspaper had a copy of the questioned document.[5]

Upon learning of the *Star*'s journalistic coup, Charles Rice, assistant vice president of Cargill, hand-delivered a letter to Revenue Agent Robert T. Johnson of the IRS,[6] on March 15, 1977. The letter informed the IRS that a document had been stolen, and that if the IRS received it, it should be aware that the document was privileged. Johnson was told by Rice that "they had a problem with this Spanish company" and Rice "stated . . . generally what the problem was."[7]

On March 16, 1977, the informant arranged a meeting with Special Agent Leon Steinberg of the IRS Intelligence Division and handed Steinberg a copy of the questioned document, a magazine article about Cargill and a listing of Cargill executives and their duties. As a condition to the delivery of the questioned document, the informant required the IRS not to disclose information which might lead to a discovery of the informant's identity, and not to reveal to others that the IRS possessed the document. Shortly after the March 16 meeting the informant telephoned the IRS and a method was devised whereby Steinberg could reach the informant.

On May 19, 1977, Revenue Agent Johnson personally delivered a copy of one of the summonses here in question to Charles Rice at Cargill's office. At that time Rice gave Agent Johnson a letter which stated that Cargill probably owed additional tax for 1972 and 1973 totalling one million dollars. The PMM/Bonnell summons was served on May 26, 1977.

After the summons was served, Cargill representatives surmised that the IRS probably possessed a copy of the questioned document, because the language of the summons tracked the language of the document. From March 15, 1977, the date that the IRS was informed that the document was purportedly both stolen and privileged, until September 7, 1977, when Cargill was informed that the IRS had the document in its possession, the IRS engaged in misleading conduct. On several occasions, IRS agents denied that the IRS possessed a copy of the questioned document. Not until September 2, after the IRS received the informant's consent, did it reveal that it had a copy of the document. On May 8, 1978, the IRS commenced these actions to enforce the summonses.

2. *Issues*

Respondents argue that the questioned document is a tainted source and that the "fruits" therefrom may not be used, on four grounds: 1) that the IRS failed to follow its own regulations; 2) that the government unreasonably seized the document without a warrant in violation of the Fourth Amendment; 3) that the document is protected by the attorney-client privilege; and 4) that the document is protected by the work-product doctrine. Respondents also allege that the document's use violates Cargill's right to effective assistance of counsel, that the government's conduct was so illegal and unethical as to violate the Fifth Amendment, and that the Magistrate erro-

---

5. The *Star* published a page-one article on March 17, 1977, entitled "$5 million in unusual fees told by Cargill."

6. Revenue Agent Johnson was in charge of an ongoing audit of Cargill for the years 1971–1973.

7. Transcript of proceedings before Magistrate J. Earl Cudd, June 7–8, 1978, (hereinafter "Tr."), at 252.

neously restricted discovery and the scope of evidentiary hearings held to delve into the IRS' conduct. Finally, respondents urge that their counterclaim for an injunction against use of the document and enforcement of the summons, identification of the informant, and return of the document be granted.

After a close analysis of the extensive briefs submitted by all parties and the transcripts of the proceedings before the Magistrate, after an *in camera* examination of the questioned document, and after hearing oral argument, this Court has determined that the questioned document neither was illegally seized nor is a privileged attorney-client communication. This opinion concludes that the document is an attorney's work product, but that the IRS should not be barred from using work product to obtain other, unprivileged materials. The rest of Cargill's and PMM's defenses are denied, with the caveat that respondents may, consistent with this memorandum and order, raise claims that the materials described in the summonses are themselves privileged. The rationale underlying these conclusions follows.

3. *Right to raise defenses in a summons proceeding*

Respondents' primary contention is that the summonses are based on a tainted source—the questioned document—and are therefore themselves tainted. Essentially, respondents claim that the summonses demand production of fruit of a poisonous tree, *see Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and that an exclusionary rule[8] should be created for summons enforcement proceedings.

*Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964), is the controlling authority as to which defenses may be raised in summons enforcement proceedings:

> [T]he witness may challenge the summons on any *appropriate ground.* This would include . . . the defenses that the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution . . . as well as that it is protected by the attorney-client privilege . . . .

375 U.S. at 449, 84 S.Ct. at 513 (emphasis added). The *Reisman* criterion is thus whether the defense is an "appropriate ground."

A. *IRS regulations*

■ The defense that the IRS' conduct in obtaining the document violated its own regulations and thereby taints the document is clearly an inappropriate defense. If the IRS' conduct surrounding the summons is "grossly improper," the summons will not be enforced. *United States v. Payner*, 434 F.Supp. 113, 129 (N.D.Ohio 1977). Such a contention is rejected later in this opinion. This Court believes that a defense that the IRS violated its regulations in a manner not involving bad faith is foreclosed by *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), wherein the Court held that tape recordings obtained in contravention of IRS regulations need not be excluded from evidence because of the conceded violation of regulations. Violation of IRS regulations, unless so egregious as to offend the Due Process Clause or unless part of a pattern of bad-faith conduct, is not an "appropriate" defense.

■ The appropriateness of the other three fruits defenses is less clear. The issue of whether the fruits of the questioned document may be summoned need not be

---

**8.** The term "exclusionary rule" is most commonly applied in the Fourth Amendment search-and-seizure context. However, as respondents note, fruits of poisonous trees are suppressed in other situations. *See, e. g., United States v. Wade*, 388 U.S. 218, 240–41, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Brewer v. Williams*, 430 U.S. 387, 398–400, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (statements obtained as result of violation of right to counsel not admissible). Throughout this opinion the term "exclusionary rule" will be used to refer to the suppression of any illegally obtained evidence and the fruits therefrom, recognizing that most exclusionary rule decisions have involved searches and seizures.

reached if the questioned document itself was not illegally seized, or is neither a privileged attorney-client communication nor work product. Each of these possibilities should first be considered.

### B. *Fourth Amendment seizure*

*Burdeau v. McDowell*, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), held that private searches and seizures that result in evidence being handed over to government agents do not violate the Fourth Amendment. In this case the search (opening the envelope and reading the questioned document) was conducted by a private individual.

■ Respondents argue, citing *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976),[9] that governmental agents illegally seized the document.[10] In the Court's judgment, *Kelly* may be distinguished from the instant case. *Kelly* involved printed material intended for public consumption and arguably protected by the First Amendment; courts are understandably reluctant to permit any searches and seizures that might constitute prior restraint of such matter. *Cf. Roaden v. Kentucky*, 413 U.S. 496, 501–06, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). The questioned document is written material, but was not composed or intended for public consumption. Second, the IRS "involvement in this case was not comparable in either quality or persistence to the official involvement present in the *Kelly* case," *United States v. Roberts*, (8th Cir. Nov. 13, 1979).

**9.** In *Kelly*, obscene literature was discovered by the employee of a shipping company, who turned over copies of the material to the FBI. The employee conducted searches on six other occasions, each time transferring to the FBI samples of the shipped material. On the final occasion, the FBI agent marked the publications and later purchased one of them. The Eighth Circuit panel found that all of the seizures, including the initial one, violated the Fourth Amendment.

**10.** *Kelly* has not been accepted by. *United States v. Sherwin*, 539 F.2d 1, 7 (9th Cir. 1976), *cert. denied*, 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978), and *United States v. Sand-*

Therefore, for the foregoing reasons, there was no violation of the Fourth Amendment.

### C. *Attorney-client privilege*

A brief review of the facts is instructive. John Levine met with PMM personnel and a Cargill attorney. Following the meetings, John McGrory, Cargill chief counsel, asked Levine to prepare a typed memorandum concerning the meeting for transmission to Palmer Baker, Cargill's New York tax counsel. The memorandum (the questioned document) was sent to McGrory on February 22, 1977. On the way, it was intercepted by the informant, who copied the document, resealed the envelope, and delivered the document to Cargill. Presumably McGrory then sent a copy of the document to Baker.

■■ Respondents make two claims of attorney-client privilege. First, they assert that the communication from Levine to McGrory was privileged. Second, they contend that the McGrory-Baker communication was privileged. In analyzing the claims, it must be remembered that respondents have the burden of establishing the attorney-client privilege, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1161 (D.S.C.1975), and that the privilege, because it excludes truthful evidence, must be narrowly construed, *Radiant Burners, Inc. v. American Gas Association*, 320 F.2d 314, 323 (7th Cir. 1963).

■ The transmission of the document from Levine to McGrory was not a privileged attorney-client communication.[11]

*ers*, 592 F.2d 788, 792 (5th Cir.), *cert. granted*, — U.S. —, 100 S.Ct. 227, 62 L.Ed.2d 168 (1979).

**11.** This Court finds that John McGrory, although himself a lawyer, is the client for purposes of this analysis. *Natta v. Zletz*, 418 F.2d 633, 637 (7th Cir. 1969); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 36 (D.Md.1974). Further, John Levine was acting in a legal capacity, according to his own testimony, when he attended the meeting and produced the

Most definitions of the privilege state that the communication must be from the client to the attorney. *See, e. g., United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358 (D.Mass.1950) (Wyzanski, J.) ("the asserted holder of the privilege [must be] . . . a client"); *Brown v. Waco Fire & Cas.,* 73 F.R.D. 297, 298–99 (S.D.Miss.1976). *But see Hesselbine v. von Wedel,* 44 F.R.D. 431, 433 (D.C.Okla.1968). Communications from the attorney to the client are ordinarily protected only if the communications reveal the substance of the client's own statements. *Matter of Fischel,* 557 F.2d 209, 211 (9th Cir. 1977); *Henderson v. Heinze,* 349 F.2d 67, 70 (9th Cir. 1965); *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 377, 388 (D.D.C.1978); *In re Westinghouse Elec. Corp. Uranium Contracts Litigation,* 76 F.R.D. 47, 56 (W.D.Pa.1977); *J. P. Foley & Co., Inc. v. Vanderbilt,* 65 F.R.D. 523, 526 (S.D.N.Y.1974). To extend the privilege to matters of which the attorney has gained knowledge from sources other than the client would carry "the obstructive effect of the privilege far beyond any justification in present-day policy . . . ." *McCormick on Evidence* § 89 (2d ed. 1972).

 In this case, the questioned document does not reveal communications from Cargill to Levine. The document is rather a summary of a meeting attended by third parties. The situation is analogous to that in *United States v. Brown,* 478 F.2d 1038 (7th Cir. 1973). There an attorney composed a memorandum summarizing a meeting attended by the attorney, an aide to the client, and an associate with a large accounting firm. The Seventh Circuit based its decision that the document was not privileged on this passage from *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947):

> [T]he protective cloak of this privilege does not extend to information which an attorney secures from a witness while

questioned document. *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 610 (8th Cir. 1977) (a matter committed to a law firm is "prima facie committed for the sake of the legal advice").

acting for his client in anticipation of litigation. Nor does this privilege concern the memoranda, briefs, communications and other writings prepared by counsel for his own use in prosecuting his client's case; and it is equally unrelated to writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories.

478 F.2d at 1040. As did the *Brown* court, this Court finds that the questioned document summarized Levine's notes and judgments, and did not reveal any communications from his client.

Thus, at the moment that the questioned document reached John McGrory, it was not privileged. It follows that at the time the informant opened the envelope and copied its contents, the document enjoyed no privileged status. The government's right to use a document, which was not privileged when obtained by the informant, should not be eviscerated by events occurring after the informant's acquisition.

 Further, the subsequent transmission of the document from McGrory to Baker did not cloak the document with privilege. "A document, which would be subject to discovery in the client's possession, does not become privileged because the client sends it to his attorney." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2017 (1970). *See United States v. Kelly,* 311 F.Supp. 1216, 1218 (E.D.Pa.1969).

Respondents attempt to circumvent this principle by noting that reports a client obtains from agents (usually employees) and submits to counsel have been found to be privileged. The law is not yet settled with respect to such reports. C. Wright & A. Miller, *supra.* This Court declines to find that John Levine was acting as an alter ego of Cargill when he attended the meeting and prepared his notes. Levine was acting as a legal adviser, not as a subordinate employee.[12]

12. In one sense attorneys are employees and agents of their clients. But in substance, the document is Levine's creation, not McGrory's and Cargill's. McGrory, in transmitting the

### D. *Work product*

Although the questioned document is not a privileged attorney-client communication, it is an attorney's work product.[13]

 This Court is convinced from evidence in the record that John Levine was acting in a legal capacity and that he prepared the document in anticipation of litigation. Levine is the head of the Dorsey firm's trial department; he was clearly not brought into the case as a business adviser, a private investigator, or a tax expert. He was present as a result of Cargill's reasonable belief that the company's tax problems would produce litigation. Litigation need only be a reasonable contingency for the work-product doctrine to apply. *American Optical Corp. v. Medtronic, Inc.*, 56 F.R.D. 426, 430–31 (D.Mass.1972); *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334, 337 (S.D.N.Y.1969). That Cargill, Palmer Baker, and John Levine could not foresee the specific litigation that has resulted does not mean that Levine did not prepare his document "with an eye toward litigation," *Hickman v. Taylor*, 329 U.S. at 511, 67 S.Ct. 385. *In re Grand Jury Proceedings*, 73 F.R.D. 647, 653 (M.D.Fla. 1977).

 Having established that the questioned document is work product,[14] the inquiry is whether it is "opinion" work product or "ordinary" work product, the two classifications implicitly created by *Hickman*. Opinion work product includes "the attorney's personal recollections, notes, and memoranda . . . ." *In re Grand Jury Proceedings* (hereinafter "*Duffy*"), 473 F.2d 840, 848 (8th Cir. 1973). Opinion work product is "absolutely, rather than conditionally protected." *Id.* In contrast, ordinary work product is discoverable "only upon a showing of substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977).

The questioned document is opinion work product. Although it is hardly replete with legal theories and strategies, it is a personal recollection or memorandum. The document is similar to that at issue in *Duffy*, in which the Eighth Circuit refused to order production of an attorney's personal recollections, notes, and memoranda summarizing his conversations with potential witnesses. *See also In re Grand Jury Investigation (Sturgis)*, 412 F.Supp. 943 (E.D.Pa. 1976) (file memoranda of attorney's telephone conversations with a witness immune from grand jury inquiry).[15]

---

document to Baker, did not alter or endorse it as might a supervisor transmitting a report submitted. A conclusion that Levine was not acting in an independent legal capacity would emasculate respondents' claim that the Levine document is covered by the work product doctrine.

**13.** *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), established the prerequisites for assertion of the work product doctrine. The criteria have been codified in Fed.R.Civ.P. 26(b)(3):

> [A] party may obtain discovery of documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or

legal theories of an attorney or other representative of a party concerning the litigation.

**14.** The IRS contends that any work product immunity was waived by the informant's action. Had the summonses required production of the questioned document itself, this Court would find that no waiver of the immunity has occurred. *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2024 (1970); *Transamerica Computer v. I.B.M.*, 573 F.2d 646, 651 (9th Cir. 1978) (waiver must be voluntary).

**15.** *In re Murphy* states that opinion work product "can be discovered only in very rare and extraordinary circumstances . . . where weighty considerations of public policy and a proper administration of justice would militate against the nondiscovery of an attorney's mental impressions." 560 F.2d at 336. A footnote, 560 F.2d at 336 n.19, citing *Duffy*, suggests that the type of proceeding in which discovery is sought is a relevant consideration, as is the nature of and necessity for the desired material. The case is not one of those rare situations.

The analysis thus far has determined that the questioned document was not illegally seized. Further, the attorney-client privilege would not bar production of the document. However, an assertion of the work-product doctrine would have been a valid defense had the summonses required production of the questioned document itself.

### E. An "exclusionary rule" in IRS summons proceedings

Having found that the questioned document is work product, it becomes necessary to confront the question whether a defense that a summons is based on work product is, if proved, sufficient to preclude judicial enforcement of the summons.

The appropriateness of the defense is immediately cast into doubt by court decisions enforcing summonses asking for documents that are purportedly work product. The Fifth Circuit has found work-product defenses inappropriate in light of the mandate to investigate given to the IRS Commissioner by Congress. *United States v. McKay*, 372 F.2d 174 (5th Cir. 1967). Recently, the Sixth Circuit has flatly concluded that the work-product doctrine "is not applicable to administrative summonses issued under 26 U.S.C. § 7602." *United States v. Upjohn Co.*, 600 F.2d 1223, 1228 n. 13 (6th Cir. 1979). On the other hand, *United States v. Brown*, 478 F.2d 1038, 1041 (7th Cir. 1973), determined that work product would be protected if the interest in its protection outweighed the IRS' need to have access to the

document. The Eighth Circuit has recognized a work-product defense in grand jury proceedings.[16] *Duffy*, 473 F.2d 840 (8th Cir. 1973).

In light of the division of opinion regarding work-product defenses, this Court will assume, without deciding, that such a defense would be appropriate if the IRS had summoned the questioned document. But the fact that two Circuits would not recognize a work-product defense had these summonses demanded production of the questioned document itself significantly undermines respondents' position that a defense to summonses demanding production of the fruits of work-product should be created.

 This Court declines to suppress the leads from the Levine work product[17] and believes that the summonses should be enforced for four related reasons.

First, the IRS is conducting an investigation, not introducing evidence at a trial. Administrative agencies have broad powers to gather information, *F.T.C. v. Texaco, Inc.*, 180 U.S.App.D.C. 390, 555 F.2d 862, 871–72 (D.C.Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977), regardless of whether the information collected would be admissible at trial. The IRS' power is arguably even greater than that of other administrative agencies because Congress has specifically provided in § 7602 of the Internal Revenue Code that "the Secretary or his delegate is authorized—1) To examine any books, papers, records, or other data which may be relevant or material

---

If the IRS did not have possession of the questioned document, it would have other avenues to follow in its quest for evidence of Cargill tax evasion, including the *Minneapolis Star* article and the March 15, 1977, letter from Charles Rice.

**16.** Grand jury and summons enforcement proceedings share certain salient characteristics. *See infra*, at 1080.

**17.** Although the precise question is whether an exclusionary rule for suppressing IRS leads from privately-obtained work product is appropriate, the analysis that follows is applicable also to all fruits defenses. There is, however, less reason to bar the use of fruits of a violation of the work-product doctrine than to preclude exploitation of illegally seized evidence or privi-

leged attorney-client communications. A summons for work product hardly infringes upon an individual's rights to the same extent as does an unconstitutional seizure. The work-product doctrine has also been perceived as less important in summons enforcement proceedings than the attorney-client privilege. *Reisman* explicitly recognized the attorney-client privilege as a defense, *see, e. g., United States v. Osborn*, 561 F.2d 1334 (9th Cir. 1977); *United States v. Tratner*, 511 F.2d 248 (7th Cir. 1975); *United States v. Brown*, 478 F.2d 1038 (10th Cir. 1973); *United States v. McKay*, 372 F.2d 147 (5th Cir. 1967) (attorney-client privilege defenses asserted and decided on merits), while, as noted, there is no consensus that the work-product defense is appropriate.

to such inquiry . . . ." The Court of Appeals for the Eighth Circuit has recognized the breadth of the IRS' investigative discretion. In one summons proceeding, the taxpayer characterized the government's efforts as a "fishing expedition." The Court's reply: "If so, the Secretary or his delegate has been specifically licensed to fish by § 7602." *United States v. Giordano*, 419 F.2d 564, 568 (8th Cir. 1969), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970). *See also United States v. Matras*, 487 F.2d 1271, 1274 (8th Cir. 1973) (IRS investigatory power should be "liberally construed"); *United States v. Bremicker*, 365 F.Supp. 701, 702 (D.Minn. 1973). This Court sees no reason to restrict the IRS' license by creating an exclusionary rule for summons proceedings. If indeed the fruits of the questioned document should be suppressed, they may be suppressed at trial, *Sanford v. United States*, 358 F.2d 685, 686 (5th Cir. 1966).

A second factor militating against suppression of fruits in a summons proceeding is the nature of the proceeding itself. Suppression of fruits from poisonous trees is common in a criminal context, but "[i]n the complex and turbulent history of the [exclusionary] rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state," *United States v. Janis*, 428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976).

An IRS summons proceeding is neither civil nor criminal, but is a hybrid. "Congress has created a law enforcement system in which criminal and civil elements are inherently intertwined." *United States v. LaSalle National Bank*, 437 U.S. 298, 309, 98 S.Ct. 2357, 2363, 57 L.Ed.2d 221 (1978).

That the summons, when issued, did not yet have a purely criminal purpose argues against application of an exclusionary rule which evolved in criminal cases.

Although IRS summons proceedings have both civil and criminal purposes, they are in many respects similar to grand jury probes. The grounds on which an administrative summons and a grand jury subpoena are issued are basically the same. *United States v. Rosinsky*, 547 F.2d 249, 252 (4th Cir. 1977). *But cf. United States v. Euge*, 578 F.2d 25, 27 (8th Cir. 1978), *cert. granted*, 441 U.S. 942, 99 S.Ct. 2159, 60 L.Ed.2d 1044 (1979). A plethora of opinions have drawn the analogy. *See, e. g., United States v. Cortese*, 540 F.2d 640, 642–43 (3rd Cir. 1976); *United States v. Widelski*, 452 F.2d 1, 4 (5th Cir. 1971), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); *United States v. Hoopingarner*, 438 F.Supp. 366, 367 (N.D.N.Y.1977); *United States v. Bank of California*, 424 F.Supp. 220, 226 n. 10 (N.D.Cal.1976). The Eighth Circuit has specifically noted that "[t]he power of the IRS to investigate the records and affairs of taxpayers has long been characterized as an inquisitorial power, analogous to that of a grand jury, and one which should be liberally construed." *United States v. Matras*, 487 F.2d 1271, 1274 (8th Cir. 1973).[18]

The strength of the summons proceeding/grand jury investigation analogy renders *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the controlling case. In *Calandra* the question presented was whether a witness summoned to appear and testify before a grand jury could refuse to answer questions on the ground that the queries were based on

---

18. *Matras'* handling of IRS summonses was cited with approval in *United States v. Bisceglia*, 420 U.S. 141, 146, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975), which also quoted *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964):

[T]he Federal Trade Commission . . . "has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." [*United States v. Morton Salt Co.*, 338 U.S. 632, 642–44, 70 S.Ct. 357, 94 L.Ed. 401 (1950).] While the power of the Commissioner of Internal Revenue derives from a different body of statutes, we do not think the analogies to other agency situations are without force when the scope of the Commissioner's power is called in question.

420 U.S. at 147–48, 95 S.Ct. at 920.

evidence obtained from an unlawful search and seizure. The Court held that the grand jury investigation could not be so restricted. Similarly, respondents may not resist production of unprivileged evidence on the ground that the summons is based on work product.[19] Respondents' attempts to distinguish IRS summons proceedings from grand jury investigations for the purposes of this case are unpersuasive.[20]

Third, excluding fruits of poisonous trees in this case would not advance the policies of exclusionary rules. The prime policy of the Fourth Amendment exclusionary rule is that of deterrence. *United States v. Calandra*, 414 U.S. at 347, 94 S.Ct. 613; *United States v. Janis*, 428 U.S. at 446, 96 S.Ct. 3021. In this case, the federal government was not involved in the taking of the questioned document. Suppression of the fruits of the document would not discourage private persons from obtaining documents and government agents from accepting them.

Nor would the policies behind the attorney-client privilege or the work-product immunity be advanced by creation of rules denying investigators the use of materials obtained by a private informant. Failure to suppress the fruits of the questioned document would not significantly discourage clients from disclosing confidences or attorneys from recording their impressions and trial strategies; lawyers have protected and ordinarily will successfully shelter such communications from private and governmental scrutiny. But even if suppression in this case produced some marginal assurance that governmental agencies would not receive legal documents obtained by private citizens, "[s]uch a holding would place corporate attorney-client privilege [and the work-product doctrine] on a higher plane than fourth amendment protected privacy." *Securities and Exchange Commission v. OKC Corp.*, 474 F.Supp. 1031, 1040 (N.D. Tex.1979).[21]

**19.** *Calandra* did specifically note that a grand jury may not violate a valid privilege. 414 U.S. at 346, 94 S.Ct. 613. For example, a grand jury may not require a lawyer to reveal client confidences. *In re Grand Jury Proceedings Involving Berkley & Co.*, 466 F.Supp. 863, 868 (D.Minn.1979). But once the grand jury obtains incompetent evidence, consideration of that evidence and, presumably, the fruits therefrom, will not lead to dismissal of the indictment. *Truchinski v. United States*, 393 F.2d 627, 633 (8th Cir.), *cert. denied*, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968); *West v. United States*, 359 F.2d 50, 56 (8th Cir.), *cert. denied*, 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966). *See Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (indictment based on hearsay evidence); *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) (indictment based on evidence obtained in violation of witness' right not to incriminate himself); *United States v. Johnson*, 419 F.2d 56 (4th Cir. 1969), *cert. denied*, 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970) (indictment based on evidence of speeches that could not be used against congressman under Speech and Debate Clause).

**20.** Indeed, respondents themselves draw the analogy by citing *United States v. Mitchell*, 372 F.Supp. 1239 (S.D.N.Y.1973), *appeal dismissed sub nom. Stans v. Gagliardi*, 485 F.2d 1290 (2d Cir. 1973), for the proposition that the fruits of privileged communications should be suppressed. In *Mitchell*, Kenneth Parkinson, attorney to Maurice Stans, produced work prod-

uct materials to a grand jury investigating another defendant. The opinion states that "Parkinson's erroneous conclusion that the information could not be withheld can in no way be imputed to Mr. Stans nor can the 'fruits' of that conclusion be used to the detriment of the defendant." 372 F.Supp. at 1246.

*Mitchell* is not persuasive authority for a work product exclusionary rule in summons or grand jury proceedings. *Mitchell* was issued prior to *Calandra*. Further, in *Mitchell* there is little explanation for the court's action. The government did not appeal the suppression order, probably because "[t]his series of questions [the fruits of Parkinson's revelations] constituted a minute and not especially significant portion of an extensive Grand Jury investigation." 372 F.Supp. at 1246. *Mitchell* is therefore weak precedent for the creation of a work product exclusionary rule in IRS summons proceedings.

**21.** *OKC Corp.* is remarkably similar to the instant case. A corporation hired a law firm to prepare a report on whether the company and its employees had violated the securities laws. The SEC somehow received a copy of the report and used it as a basis for developing independent, unprivileged evidence. OKC sought to prevent the SEC from exploiting the purportedly privileged report. The district court refused to preclude the SEC from using the fruits of the report.

Finally, the summonses will likely result in reliable evidence. Exclusionary rules are receiving mounting criticism from judges and scholars because they undermine the truth-seeking process. *See, e. g., Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 411, 91 S.Ct. 1999, 29 L.Ed.2d 619 (Burger, C. J., dissenting); *Stone v. Powell*, 428 U.S. 465, 490, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L. Rev. 349, 429 (1974). As the Court stated in *United States v. Janis*, 428 U.S. at 448–49, 96 S.Ct. at 3029, the Fourth Amendment exclusionary rule "imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." It must again be emphasized that the question before the Court is not whether the summoned documents may be introduced at trial. But to the extent that a work-product fruits defense would hinder this investigation and preclude the discovery of relevant information, a substantial cost would be imposed on the societal interest in enforcement of the nation's revenue laws.

Respondents rely heavily on *United States v. Bank of Commerce*, 405 F.2d 931 (3rd Cir. 1969), wherein the court refused to enforce a summons for bank records which would not have been called to the attention of the IRS but for an illegal search and seizure. This Court believes that *Bank of Commerce* is no longer good law in light of Supreme Court exclusionary rule cases since 1969. The other cases cited by respondents are distinguishable.[22]

▮ This Court therefore holds that a work product fruits defense is not appropri-

ate in a summons enforcement proceeding when the IRS acquires work product from a private source. Of course, if all of the facts and circumstances behind the acquisition suggest "grossly improper" conduct, courts may not allow their process to be abused and may thereby refuse to enforce a summons.

*4. "Criminal purpose"*

In the summer of 1979 a special grand jury was convened to investigate possible Cargill criminal tax violations. On August 28, 1979, eight grand jury subpoenas *duces tecum* were issued, covering all of the documents listed in the IRS summonses in addition to a wealth of other material. In its memorandum in support of a motion to quash the grand jury subpoenas, Cargill has argued that the institution of the grand jury investigation imbues the summonses with a "criminal purpose." 26 U.S.C. § 7602 does not permit exclusively criminal use of summonses. *United States v. LaSalle National Bank*, 437 U.S. 298, 316, n. 18, 98 S.Ct. 2357, 57 L.Ed.2d 221 n. 18 (1978).

▮ But at the time of issuance of the summonses this matter had not been referred to the Justice Department, the stage at which a summons acquires a "criminal purpose." *United States v. LaSalle National Bank, supra.* The validity of a summons is determined as of the date of its issuance. *Couch v. United States*, 409 U.S. 322, 329 n. 9, 93 S.Ct. 611, 31 L.Ed.2d 548 (1973); *United States v. Rosinsky*, 547 F.2d 249, 254 (4th Cir. 1977). *Cf. United States v. Giordano*, 419 F.2d 564, 568 (8th Cir. 1969). Clearly, the summonses are not un-

---

**22.** In *Control Data Corp. v. I.B.M. Corp.*, 16 F.R.Serv.2d 1233 (D.Minn.1972), massive document discovery was ordered. A small percentage of documents that were privileged slipped through IBM's screening procedures and ended up in the hands of Control Data. The court's remedial order provided that "[a]ny document found to be privileged shall not be admissible in evidence at any trial, or hearing nor used in depositions or other discovery proceedings." 16 F.R.Serv.2d at 1237. But the quotation provides no rationale for suppressing leads. The court's action occurred under Fed.R.Civ.P. 26,

which provides that discovery may be limited by order of the court. The remedial order was most likely issued because the original discovery schedule was too strenuous, causing "inevitable problems," *I.B.M. Corp. v. United States*, 16 F.R.Serv.2d 1217, 1219 (2d Cir. 1972).

The other cases respondents cite are criminal cases, contain no discussion of the rationale for suppression of fruits, or were handed down prior to the Supreme Court's more careful tailoring of the Fourth Amendment exclusionary rule.

enforceable on the ground that they have a "criminal purpose."

### 5. Fifth and Sixth Amendment violations

 Respondents contend that use of the questioned document violates their rights to effective assistance of counsel under the Fifth and Sixth Amendments to the United States Constitution, see *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Levy*, 577 F.2d 200 (3rd Cir. 1978), and generally offends due process, see *United States v. Payner*, 434 F.Supp. 113 (N.D.Ohio 1977). No Sixth Amendment violation is evident; that amendment, by its terms, applies only to criminal prosecutions. Neither has the Fifth Amendment been violated.

> Due Process requires exclusion of reliable evidence only in those cases in which government officials obtain the challenged materials in a grossly improper fashion, i. e., by engaging in illegal conduct which exhibits their knowing and purposeful *bad faith hostility* to any person's fundamental constitutional rights.

*United States v. Payner*, 434 F.Supp. 113, 129 (N.D.Ohio 1977) (emphasis in original).

 This case does not pose instances of "grossly improper" IRS conduct. The IRS did nothing improper to obtain the questioned document. Once it had the document, the IRS was not candid with respondents for a period of time in denying that it had the document, but the misleading conduct was merely temporary, only minimally prejudicial, and certainly violated none of respondents' fundamental constitutional rights. The extensive discovery enjoyed by the respondents has exposed no other instances of bad faith.[23]

Respondents' other contentions, concerning violations of IRS regulations, Minnesota statutes, and federal laws, are without merit. This case presents the not unusual situation of the government using physical or documentary evidence acquired and provided by a private individual, see *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), which is certainly not "grossly improper" conduct.

### 6. The counterclaim

In its counterclaim respondent Cargill seeks to enjoin the government from using the questioned document as well as derivative evidence obtained from the document. It also asks that the government be forced to return all copies of the document.[24]

The counterclaim attempts to invoke this Court's equitable or anomalous jurisdiction[25] to suppress and return illegally obtained evidence before any indictments have issued or before civil complaints have been filed. "[T]he jurisdiction is an extraordinary one and is to be exercised with caution and restraint." *Pieper v. United States*, 604 F.2d 1131, 1133 (8th Cir. 1979), citing *Meier v. Keller*, 521 F.2d 548, 554 (9th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *Hunsucker v. Phinney*, 497 F.2d 29, 32, 34 (5th Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).

 This Court will forego use of this extraordinary jurisdiction. Although, as noted above, the questioned document is work product, use of the document to obtain unprivileged evidence violates no rights of respondents. Further, respondents and their officers have an adequate remedy at law, *Marshall v. Central Mine Equipment Company*, 608 F.2d 719, 721 (8th Cir. 1979); whether the questioned document or the fruits therefrom are admissible at trial may be decided by the trial judge. Also, respon-

---

**23.** At one point respondents speculated that the informant was a "spy" in the Cargill corporation or in the Dorsey law firm. Such speculations have proved groundless.

**24.** The counterclaim also prayed that the informant be identified. Respondents have now had an opportunity to question the informant.

**25.** "Anomalous jurisdiction" is a judicially-created equitable doctrine, which is based upon the court's supervisory authority over its officers and agents. The jurisdiction usually comes into play when there has been a "callous disregard for constitutional rights" by federal agents. *Hunsucker v. Phinney*, 497 F.2d 29, 34 (5th Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975).

dents have demonstrated no need for the return of copies of the document. *Richey v. Smith*, 515 F.2d 1239, 1243 (5th Cir. 1975).

### 7. *Discovery*

Respondents consistently have argued that they are entitled to broad discovery before enforcement of the IRS summonses.

In this case such discovery has been ordered. On June 7 and June 8, 1978, Magistrate J. Earl Cudd conducted proceedings in which seven IRS agents and John Levine gave testimony and ten exhibits were received into evidence. The depositions and oral arguments before the Magistrate consumed 473 pages of transcript.

At the 1978 hearing, the Magistrate noted that he "would be very reluctant to disclose the identity of [the] informant" (Tr. 34). The Magistrate proceeded to sustain objections to questions delving into the informant's identity. He allowed extensive inquiry on all other issues.

 On October 16, 1979, the Assistant United States Attorney filed with this Court an affidavit from Larry D. Bergsgaard, a special agent with the Criminal Investigation Division of the IRS. The affidavit was very specific as to the informant's background and stated that he was a former messenger for the Dorsey law firm, virtually revealing the identity of the informant. In such circumstances, the "informant's privilege" was no longer applicable. *See Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); 2 C. Wright & A. Miller, *Federal Practice and Procedure* § 406 (1969).

Consequently, on October 31, 1979, this Court ordered that the informant appear before the Magistrate and that respondents be given wide latitude to determine whether the informant had any connections with the IRS or with any other governmental agency. After independently reviewing the transcript of that hearing, this Court agrees with the Magistrate's finding and conclusion that the informant had no governmental connection, and that the government was not involved in the taking of the questioned document.

 In sum, respondents have enjoyed extensive discovery and have had the opportunity to question the informant. The latitude allowed respondents has been especially broad in light of the numerous decisions holding that discovery may be limited in summons enforcement proceedings. *See, e. g., United States v. Garrett*, 571 F.2d 1323, 1326–27 (5th Cir. 1978); *United States v. Church of Scientology of California*, 520 F.2d 818 (9th Cir. 1975); *United States v. Interstate Tool & Engineering Corp.*, 526 F.2d 59, 62 (7th Cir. 1975).

### 8. *Conclusion and order*

The IRS summonses are enforceable although based on a document that is work product. This opinion draws no conclusion as to the admissibility at any trial, civil or criminal, of the questioned document or its fruits.

During oral arguments Magistrate Cudd indicated that respondents were free to assert the argument that the documents named in the summonses were themselves privileged, should this Court first determine that the summonses were otherwise enforceable. The determination that the summonses are enforceable has now been made.

Therefore, based upon this Court's independent determination and *de novo* review of the record, both as to questions of law and questions of fact, IT IS ORDERED that:

1. Respondents' objections to the Magistrate's reports and their defenses to enforcement of the summonses be and hereby are denied, and the summonses are hereby enforced consistent with this order.

2. The counterclaim of respondent Cargill be and hereby is dismissed without prejudice.

3. Within a reasonable time, not exceeding thirty days from the filing of this Order, respondents produce to the Magistrate for an expeditious *in camera* review any materials identified in the summonses which respondents claim to be privileged.

4. Within a reasonable time, not exceeding thirty days from the filing of this Order, respondents produce to the Internal Revenue Service all other materials identified in the summonses.